**MONAHAN'S MARINE, INC.,**
**Plaintiff, Appellant,**

v.

**BOSTON WHALER, INC., et al.,**
**Defendants, Appellees.**

No. 88–1375.

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1988.

Decided Feb. 3, 1989.

As Modified on Denial of Rehearing March 13, 1989.

Stephen M. Trattner, Washington, D.C., with whom Robert D. Loventhal, Michael R. Hafitz and Loventhal & Hafitz, Braintree, Mass., were on brief, for appellant.

William F. Lee with whom Thomas N. O'Connor, Jane E. Serene and Hale and Dorr, Boston, Mass., were on brief, for appellees Boston Whaler, Inc., David R. Loveless and Perry Connolly.

Lauren E. Duca with whom William A. Zucker and Gadsby & Hannah, Boston, Mass., were on brief, for appellee Port Marine Center, Inc.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

BREYER, Circuit Judge.

Monahan's Marine, Inc. (hereinafter "Monahan's"), a Massachusetts boat dealer, says that Boston Whaler, Inc. (hereinafter "Whaler"), a Massachusetts boat builder, sold some of its boats to competing Massachusetts dealers at lower prices and on better terms. Monahan's sued Whaler, two of its officers, and two competing dealers, claiming that this "discrimination" violated the Sherman Act, 15 U.S.C. § 1 (1982). The district court granted summary judgment for all defendants, *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 676 F.Supp. 379 (D.Mass.1987), and Monahan's now appeals. After examining the record, we can find no significant evidence of an agreement "in restraint of trade." *See* § 1. Consequently, the district court correctly granted summary judgment for defendants.

## I.

The parties, in their cross-motions for summary judgment, agreed that: (1) Monahan's retails expensive fishing boats in Weymouth, Massachusetts; (2) Monahan's has sold Whaler boats since 1975; (3) Whaler boats account for about 25 percent of Monahan's business; and (4) Monahan's competes with about 5 other New England Whaler dealers, including Falmouth Harbor, in Falmouth, Massachusetts, and Port Marine, in Danvers, Massachusetts.

Monahan's says that in 1981–1983 Whaler sold boats to Falmouth Harbor and Port Marine at prices lower than, and terms better than, it offered to Monahan's. Specifically, Monahan's says:

1. In August 1981 Whaler sent Falmouth several truckloads of boats without charging for delivery, and on credit, while Monahan's had to pay cash and pay for delivery, for similar boats.

2. In 1982 Whaler stored certain "listed" boats (boats with minor defects) in a shipyard that Falmouth controlled, permit- ting Falmouth to avoid transport costs, to have the boats in stock without paying for them first, and to sell the boats conveniently. Monahan's could not readily inspect and purchase these boats itself, and could only sell these boats by bringing customers to a competitor's shipyard.

3. In 1982 Whaler sold 31 boats to Port Marine at a 10 percent discount and without requiring payment in advance or charging for delivery, and did not make similar terms available to Monahan's until after the selling season was over.

4. Whaler extended its 1982–1983 "Fall Discount Program" prices to Port Marine, allowing Port an 8 percent discount on 51 boats, even though its order was not completed until after that program expired.

Monahan's adds that these "special deals" made it more difficult to sell Whaler boats, hurt its business, and eventually (after Monahan's complained) led Whaler to terminate it as a Whaler dealer. The record reveals, however, that, perhaps because of new entry, the number of Whaler dealers remained the same.

Whaler, in defense, argues that it made its "special deals" available to Monahan's as well as to Monahan's competitors. In our view, the record contains evidence sufficient to raise a triable issue of fact on this issue. But even if Monahan's shows that Whaler discriminated against it in this respect, Monahan's cannot win this lawsuit, for the evidence does not permit a finding of a "restraint of trade." *See* § 1.

## II.

■ Section 1 of the Sherman Act forbids (1) agreements ("every contract, combination ... or conspiracy") that are (2) "in restraint of trade." The only relevant agreements that the record shows in this case are Whaler's agreements to sell boats to Monahan's competitors at low prices. But those agreements, as far as the record reveals, are not "in restraint of trade." That is to say, a court, applying antitrust law's well known "rule of reason," could

* Of the District of Massachusetts, sitting by desig-

nation.

not conclude that the anticompetitive effects of the agreements outweigh their legitimate business justifications. *See Business Electronics v. Sharp Electronics*, — U.S. ——, 108 S.Ct. 1515, 1521–22, 99 L.Ed.2d 808 (1988) (rule of reason applies to all vertical restraints of trade except price fixing, which is *per se* illegal); *AAA Liquors, Inc. v. Joseph E. Seagram & Sons*, 705 F.2d 1203, 1207–08 (10th Cir. 1982) (applying rule of reason test to small retailers' § 1 claim that liquor distributor offered discriminatory discounts to certain large retailers); *Black Gold, Ltd. v. Rockwool Industries, Inc.*, 729 F.2d 676, 683–84 (10th Cir.1984) (applying 'unreasonableness' test to price discrimination claim under § 1); *see also Interface Group, Inc. v. Mass. Port Authority*, 816 F.2d 9, 10 (1st Cir.1987) ("anticompetitive," in the context of the Sherman Act, "refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process").

We are willing to assume for the sake of argument that Monahan's can show that Whaler made boats available to its competitors on better terms and at lower prices. Nonetheless, we conclude that Whaler's actions (which we shall call "price discrimination") are not, on balance, anticompetitive for Sherman Act purposes, for the following reasons:

First, Whaler's low prices were not predatory; Monahan's makes no allegation that the "special deals" Whaler offered to Falmouth and Port amounted to pricing below Whaler's costs. *See Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 231 (1st Cir.1983) (defining "predatory" pricing as pricing below seller's costs, and discussing various cost tests; such pricing is predatory because it is a non-sustainable price that can can drive competitors from the market and free the seller to raise prices well above competitive levels). The Sherman Act's very purpose is to help consumers, in part by bringing about low, nonpredatory prices. *See Interface Group*, 816 F.2d at 10 (Sherman Act seeks to protect the competitive process that will "bring consumers the benefits of lower prices, better products, and more efficient production

methods"); *Barry Wright*, 724 F.2d at 231–32 (goal of Sherman Act is "the low price levels that one would find in well-functioning competitive markets;" courts' task is to develop rules that will discourage predatory pricing but allow "desirable price-cutting activity").

Second, we have held, in the context of a Sherman Act § 2 claim, that a "dominant firm" can lawfully charge a low, nonpredatory price, even though *"it could use an 'above cost' price cut to drive out competition, and then later raise prices to levels higher than they otherwise would be."* *Barry Wright*, 724 F.2d at 233 (emphasis added). We held this, not because the possible result we have italicized is desirable. It is not. Our holding, rather, rested upon our concern that judicial efforts to prevent firms from charging low, nonpredatory prices, despite an occasional beneficial result, would more often significantly interfere with the achievement of the Sherman Act's basic and important low price objectives. *Id.* at 233–35. We have discussed this matter at length in *Barry Wright* and need not repeat that discussion here.

Third, we recognize that the economic context here is different from that in *Barry Wright*. In *Barry Wright* the situation was "horizontal," in the sense that a seller offering low prices to customers threatened injury to other sellers competing for those customers' business. *Id.* at 229–30. Here the context is "vertical;" a supplier offering low prices to some of its dealers threatens injury to a competing dealer. But, we do not see how this distinction can make a significant legal difference, at least not in the context of the present case, where there is no significant evidence that the low prices could, in fact, have led to a radical and anticompetitive restructuring of the dealers' market.

For one thing, in both contexts, a judicial holding that price discrimination is unlawful has the same potential to harm competition. If suppliers cannot charge low, nonpredatory prices without the threat of antitrust actions, they will hesitate to cut their prices. If suppliers must cut prices to all competing dealers or to none, if they

cannot decide to favor a single dealer, say, to promote their product or to target a particular area, they may well decide not to cut prices at all, perhaps to the benefit of the dealers, but certainly to the detriment of the Sherman Act's ultimate beneficiary, the consumer. *See AAA Liquors, Inc.*, 705 F.2d at 1207 (Sherman Act does not require a supplier to offer same price to all dealers; if required to do so, it would be "inhibited from either starting or responding to a local price war," and competition would be discouraged); *cf. United States v. Container Corp.*, 393 U.S. 333, 336–38, 89 S.Ct. 510, 512–13, 21 L.Ed.2d 526 (1969) (exchange of information in a concentrated industry tending to stabilize prices, so that sellers cut prices either simultaneously or not at all, was "within the ban of § 1").

For another thing, the primary contrary consideration (that is, the primary reason militating *in favor* of forbidding the low price) is the same here as in *Barry Wright.* That consideration is the fear that the dealers who benefit from the supplier's selectively charged low prices will then lower their own prices to the point where they drive their competitors out of business, after which they may raise their own prices well above competitive levels. *Cf. Barry Wright,* 724 F.2d at 233. It is this fear that, from a procompetitive perspective, gives weight to Monahan's complaint about the *selective* nature of the price cuts. In the vertical context of this case, however, we need not give *more* weight to this consideration than we did in *Barry Wright,* 724 F.2d at 233–35. Indeed, there are reasons for giving it *less* weight. In the vertical context, the price cutting supplier himself typically has an economic interest in encouraging competition among his dealers, and thus preventing the emergence of any "dealer monopoly." Other things being equal, a profit-maximizing dealer monopolist would set retail prices that, from the supplier's perspective, are too high and unduly restrict the product's sales. To understand just how this is so, *see* P. Areeda, *Antitrust Analysis* ¶ 402 (4th ed. 1988) (ordinarily manufacturers will maximize their profits by encouraging maximum competition among dealers and low retail

profit margins). For this reason, the supplier himself often has an incentive to limit the anticompetitive consequences of any selective price cutting. Of course, in some instances this incentive is not controlling; a supplier may sometimes prefer to have only one dealer, perhaps because he thinks that is the best way to promote his product. But, the antitrust laws leave him perfectly free to choose to distribute through a single dealer if he wishes. *See Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (manufacturers generally have the right to deal, or refuse to deal, with whomever they like); *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418, 420–21 (D.C.Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957) (exclusive dealership agreements, protecting dealers from competition, are not unreasonable restraints of trade under § 1).

All this is simply to say that the "vertical context" in which the present case arises, and the fact that the supplier charged low prices selectively, offer no convincing reason here for us to depart from our conclusion in *Barry Wright,* that the Sherman Act does not normally forbid a seller from charging a low, nonpredatory price, even though that price may make it harder for a competitor to enter, or to remain in, the market.

■ Fourth, we recognize that the selective price cutting here at issue might violate a different antitrust law, the Robinson–Patman Act, 15 U.S.C. § 13 (1982), had the plaintiff met that Act's interstate commerce requirement, § 13(a). But, that fact does not show that it also violates the Sherman Act. Unlike the Sherman Act, which protects "*competition*, not *competitors,*" *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), the Robinson–Patman Act extends its protection to competitors. It forbids sellers to "discriminate in price between different purchasers of commodities," where such discrimination tends to "injure, destroy or prevent competition *with* any person who ... receives the benefit of such discrimination." Section 13(a)

(emphasis added). That single word "with" makes a considerable practical difference. It means that the Act protects *those who compete* with a favored seller, not just the overall competitive process. Hence, in many circumstances, the Robinson–Patman Act forbids selective but nonpredatory price cutting.

The antitrust enforcement agencies have recognized the anticompetitive dangers that lurk in such rules. The Department of Justice wrote in 1978 that the

> testimony of antitrust enforcement officials is that ... any prohibition directed against non-predatory price discriminations only subjects the business community to needlessly complex regulatory restrictions. Such restrictions are inherently more likely to impede procompetitive behavior than to prevent activity that may ultimately lead to lessened competition.

U.S. Justice Department, Antitrust Division, Report on the Robinson–Patman Act 260–61 (1977). And, the Supreme Court has written about the potential "tension" that arises between the Sherman and Robinson–Patman Acts due to the latter's broad prohibition of price discrimination. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 450–51, 98 S.Ct. 2864, 2880–81, 57 L.Ed.2d 854 (1978) (tension arises from prohibition of price discrimination).

Of course, those who wrote the Robinson–Patman Act had certain procompetitive objectives in mind. They feared that large retailers such as "chain stores" might obtain so many price advantages that they eventually would drive smaller competitors from the field, enabling them to charge high, noncompetitive prices for, say, groceries, clothing, or pharmaceuticals. *See* Justice Department Report, *supra*, at 101–114; P. Areeda, *supra*, at ¶ 602; F. Rowe, *Price Discrimination under the Robinson–Patman Act* 3–11, 22–23 (1962). The evidence in this case, however, would not permit a finding that any such result is at all likely. It does not, for example, show any persistent pattern of discrimination that systematically favors large dealers,

nor the likely disappearance of smaller firms, to the point where the market would become significantly more concentrated. (Compare the Justice Department's legislative proposals designed to minimize the Robinson–Patman Act's anticompetitive effects. Justice Department Report, *supra*, at 262.) Rather, the record here shows injury only to the extent that the discounts made it more difficult for certain nonfavored dealers to sell their products; it did not significantly change the structure of the "retail high quality fishing boat" market. Thus, we need not consider here a case of serious, demonstrated injury to the market itself; rather, we need only hold that evidence of a violation of the Robinson–Patman Act, showing injury only to competitors, does not automatically show a violation of the Sherman Act as well. For the reasons previously set out, the record here does not permit a finding of conduct that is, on balance, anticompetitive within the meaning of the Sherman Act.

Fifth, our conclusion here is consistent with that of other circuits that have considered the matter. Those circuits have found nothing anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable terms, to some of its dealers, even though such discrimination harms the non-favored dealers. *AAA Liquors, Inc.*, 705 F.2d at 1207 (suppliers are permitted to "start a price war" among retailers; § 1 does not require a manufacturer to offer all dealers the same prices); *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 887 (9th Cir.1982) ("the price discrimination which results where buyers seek competitive advantage from sellers encourages the aims of the Sherman Act"); *Ron Tonkin Gran Turismo v. Fiat Distributors*, 637 F.2d 1376, 1387–88 (9th Cir. 1981) (courts are reluctant to interfere with manufacturers' business decisions on product distribution; § 1 does not require manufacturers to treat all dealers equally).

■ In addition to its "price discrimination" claim, Monahan's argues that Whaler violated the Sherman Act by terminating

its dealership because it complained about the discrimination. Monahan's concedes, however, that the termination was the unilateral act of Whaler alone, so it cannot be "concerted activity" in violation of § 1. The only way in which appellant argues that its termination could violate the Sherman Act is if it was retaliation for Monahan's protests against the price discrimination, and thus was "in furtherance" of a violation of § 1. *See Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 629 (4th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980). Since we have found that the price discrimination Monahan's complained about does not violate § 1, Monahan's termination could not have been "in furtherance" of any activity prohibited by § 1. We need not discuss the antitrust liability of the other four defendants. For the reasons already stated as to Whaler, summary judgment in their favor was proper. And, once the "federal question" claims were properly dismissed, the district court was correct in declining to exercise pendent jurisdiction over Monahan's state law claims for breach of contract and unfair trade practices. *See Monahan's Marine*, 676 F.Supp. at 383.

For these reasons, the judgment of the district court is

AFFIRMED.