CLAMP–ALL CORPORATION,
Plaintiff, Appellant,

v.

CAST IRON SOIL PIPE INSTITUTE,
et al., Defendants, Appellees.

No. 87–1697.

United States Court of Appeals,
First Circuit.

Heard Jan. 4, 1988.
Decided June 30, 1988.

480

Richard S. Harrell, Washington, D.C., with whom Ronald E. Harding and Weston, Patrick, Willard & Redding, P.A., Boston, Mass., were on brief, for plaintiff, appellant.

John J. Curtin, Jr., with whom William G. Southard, Jody E. Forchheimer, Eve Jacobs–Carnahan, Bingham, Dana & Gould, John M. Harrington, Jr., Thomas H. Hannigan, Jr., Ropes & Gray, Alan R. Hoffman, M. Eric Schoenberg, Lynch, Brewer, Hoffman & Sands, Mark W. Pearlstein, Goodwin, Procter & Hoar, Boston, Mass., Henry P. Sailer, Elizabeth Foote, Covington & Burling, Washington, D.C., John E. Tener, Theodore Tucci and Robinson & Cole, Hartford, Conn., were on brief, for defendants, appellees.

Andrew M. Higgins and Casner, Edwards & Roseman, Boston, Mass., on brief, for defendant, appellee American Brass & Iron Foundry.

Before CAMPBELL, Chief Judge, BREYER and SELYA, Circuit Judges.

BREYER, Circuit Judge.

The plaintiff in this antitrust action, Clamp–All Corporation, sued the Cast Iron Soil Pipe Institute ("CISPI") and several of its members, charging that they had unlawfully restrained trade in (or monopolized or attempted to monopolize) the sale of hubless pipe couplings by means of improper pricing, improper behavior in respect to "quality-certification" provided by state and private organizations, and other improper trade practices. 15 U.S.C. §§ 1 & 2 (1982), 15 U.S.C. § 1125(a) (1982). The district court granted defendants' motion for summary judgment on the pricing (and certain other) counts, and, after hearing all the plaintiff's evidence, directed a verdict in defendants' favor; the plaintiff appeals.

We have examined the lengthy record and conclude that the district court was correct. No reasonable jury could have found facts sufficient to show a violation of the antitrust laws. We therefore affirm the court's judgment.

I

To understand this highly fact-based appeal, one must keep in mind the following background:

1. Hubless couplings are used to join segments of pipe, such as water pipe or sewer pipe.

2. Several different manufacturers have made, and still make, various kinds of pipe couplings. The old fashioned method of joining segments of pipe apparently was to make one end slightly larger than the other, and then to fit the small end of one segment into the large end of the other. The larger opening was called the "hub" and the smaller end the "spigot." We think they looked about like this:

The newer method of joining pipe segments keeps both ends the same size. A sleeve fits around the two ends to be joined and a metal band holds the sleeve in place.

3. CISPI is a trade association of *pipe* manufacturers, all of whom sell, and many of whom also make, a particular type of coupling known as a CISPI coupling. It consists of a simple sleeve of the sort described. It fits between lugs each placed a bit away from the end of each pipe segment (perhaps they help hold the sleeve in place). We think the CISPI coupling looks something like this:

CISPI introduced hubless couplings to the market in 1963. CISPI controlled the patent on its coupling until 1984, licensing CISPI members to make and sell it.

4. Clamp–All is one of several firms that make competing pipe couplings. The

Clamp–All and CISPI couplings appear quite similar, but the list price of Clamp–All's coupling is typically four to five times that of CISPI's, and the Clamp–All coupling will outperform the CISPI coupling in certain respects: it is wider, which makes it

more secure and enables it to withstand greater water pressure; it is made of more durable (and more expensive) materials; and it is somewhat easier to install.

5. Exactly what share of the total market for water pipe couplings (outside of Massachusetts) CISPI couplings account for is a matter in dispute. Everyone agrees that CISPI's share is large, but they agree, too, that several companies other than Clamp–All and CISPI members sell a significant number of couplings. Inside Massachusetts, where Clamp–All had a monopoly for several years because only its coupling met the state's performance standard, Clamp–All controls about 65 percent of the coupling market.

Basically, Clamp–All charges that its relative lack of success outside Massachusetts is due to various anti-competitive (indeed, anti-Clamp–All) practices employed by CISPI members; otherwise, says Clamp–All, its sales record elsewhere would resemble its record in Massachusetts. The CISPI defendants deny all anti-competitive behavior; they add that Clamp–All's Massachusetts success reflects Clamp–All's own, partly successful, efforts to convince certifiers and regulators to keep the less expensive CISPI coupling out of the state.

Our concern here is with Clamp–All's charges, not CISPI's. We have proceeded to evaluate the legal merits of Clamp–All's many different claims as follows. First, we have read the record, marshalling the evidence in respect to each charge. Second, we have assumed a set of facts as favorable to Clamp–All, in respect to each charge, as the evidence will reasonably permit. *See Goldstein v. Kelleher,* 728 F.2d 32, 39 (1st Cir.), *cert. denied,* 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Third, we have determined, as a matter of law, *see* 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 315b (1978) [hereafter Areeda & Turner], whether that version of the facts reveals a violation of the antitrust laws; whether, for example, it shows predatory pricing, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), or an "unreasonable restraint of trade,"

*Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

We conclude that the facts do not show an antitrust violation. To explain our conclusions, we shall group Clamp–All's many charges into three categories: those concerning pricing practices, those concerning CISPI efforts to influence certification standards, and those concerning allegedly unreasonable marketing practices.

## II

The significant evidence that we have found in respect to CISPI's pricing practices consists of the following:

1. The defendants published identical list prices for various products including couplings. One defendant testified that the prices on the list established a "defined differential" among different sizes of pipe, couplings, and related equipment.

2. Two CISPI firms, Tyler and American Brass & Iron Foundry ('AB & I'), firms that were defendants in this case initially, but which were no longer defendants at the time of trial, had price lists that showed "returns" to the firm to be less than "costs." To be more specific, the Tyler price list, in respect to "hubless couplings," showed in the column entitled "Return FOB Taylor" ".67," and in the column entitled "average unit cost," the figure ".78." In respect to AB & I's couplings, the evidence was conflicting. Although the category marked "Sales" was lower than that marked "Cost," the category marked "Unit Price" was *higher* than that marked "Unit Cost."

3. Two witnesses testified that Tyler's president once said at a CISPI meeting in 1981 that Tyler, the industry price leader, would not raise its prices until Central Foundry went out of business. A month later, Central Foundry did go out of business; Tyler then raised its prices, and the other CISPI members followed Tyler's lead.

4. Clamp–All's expert testified that CISPI members gave discounts on a geo-

graphical basis, which discounts did not reflect delivery cost differences, but, rather, reflected a "multiple basing point pricing scheme."

We conclude that this evidence does not show unlawfully low prices, prices that could hurt Clamp–All. Clamp–All comes closer to showing unreasonably high CISPI prices, but any such showing may reflect no more than an industry concentrated enough for each firm to set prices "interdependently" (each firm, aware that competitors will quickly match price cuts, may keep its prices high); and higher than competitive prices help Clamp–All rather than hurt it. *See Matsushita,* 475 U.S. at 583, 106 S.Ct. at 1354. We now consider each of Clamp–All's pricing claims in greater detail.

a. Clamp–All suggests that this evidence shows unlawful "predatory pricing." As we explained in detail in *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227 (1st Cir.1983), however, "predatory pricing" occurs when a firm sets its prices temporarily below its costs, with the hope that the low price will drive a competitor out of business, after which the "predatory" firm will raise its prices so high that it will recoup its temporary losses and earn additional profit, all before new firms, attracted by the high prices, enter its market and force prices down. *Id.* at 232–35; *see Matsushita,* 475 U.S. at 588–95, 106 S.Ct. at 1357–61. We said that *ordinarily* the measure of a "predatory price" is price below "incremental cost." *Barry Wright,* 724 F.2d at 232–33. That is to say, the addition to total cost (to the firm) of producing and selling additional output would exceed the return from selling that additional output.

 The evidence in the record is insufficient to show such pricing by defendants here. For one thing, the product price lists from Tyler and AB & I contain no explanation about what the numbers on them mean. Indeed, Tyler's list refers to a vast number of different products and contains many products in respect to which the number in the "NET FOB" column is lower than that in the "AVERAGE UNIT COST" column. Yet, the plaintiffs do not argue that Tyler was pricing large numbers of its products, including such products as thumbscrews, seal gaskets, seal lubricants, plugs, and something called a "No-hub San Tee," at predatory levels. Perhaps the list shows that Tyler, like a hardware store owner, keeps records that allocate certain costs (such as rent or electricity) among related products proportionately, but then Tyler recovers different amounts of those costs from the sales of different products. (A hardware store owner does not set prices to recover precisely the same percentage of his rent from the sale of each bolt, garden tool, or lightbulb; rather, he sets prices so that he recovers the totality of his overhead from the totality of all his sales with different products likely making different contributions.) Be that as it may, we do not see how a jury could know, without more precise evidence or an explanation, what either Tyler's or AB & I's price lists show, nor do we see how it could rest a conclusion of "price below incremental cost" on a few such unexplained lists alone. Nor does plaintiff correct the evidentiary deficiency by pointing to Tyler's president's remark at the 1981 CISPI meeting, for that remark (and subsequent conduct) simply shows (at best) a price increase after the demise of a competitor; it does not significantly help show that the relevant prices were unlawfully low to begin with.

For another thing, neither Tyler nor AB & I were defendants at the time of trial. Thus, plaintiff had to use this price list evidence to show that *other* firms set prices below *their* incremental costs. The fact that hubless couplings were simple products with similar costs may tend to show that Tyler's and AB & I's cost/price ratios and defendants' were the same. But, the equally important facts that Tyler and AB & I made many related products; that many costs of producing these products were likely related (*e.g.,* shared overhead); that present defendants produced a *different* mix of products; and that each of their product by product cost relationships (*e.g.,* comparative shares of overhead or other common costs) were therefore likely

different from Tyler's and AB & I's, together make Tyler's and AB & I's price lists close to worthless as evidence that any of these *other* firms (the present defendants) priced couplings below its own incremental costs. The district court correctly concluded that a jury could not find, without impermissible speculation, that these defendants priced couplings below their costs, whether defined as "incremental costs" or any other arguably appropriate cost measure.

■ b. Appellant, taking an opposite tack, next argues that identical price lists and testimony about a "defined differential" indicate an agreement among CISPI defendants to fix prices, presumably higher than competitive prices. (The defendants, selling identical products, would not need to *agree* to keep prices low; a price cut by any one of them would likely force the others to follow.) Of course, any such agreement, by keeping coupling prices *up*, would likely help the plaintiff, not hurt it. *See Matsushita*, 475 U.S. at 583, 106 S.Ct. at 1354.

This is not to say that the evidence here would permit a jury to find any such agreement. Even if one assumes that the similar prices on the lists do not simply reflect ordinary forces of competition at work among firms selling virtually identical products, the price lists still show no more than what defendants concede: that each firm, acting individually, copied the price list of the industry leader. A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry. *See* 6 Areeda & Turner ¶¶ 1432–33. And, the fact that the CISPI firms often set prices that deviated from their price lists helps support the inference that the similarity of price lists reflects *individual* decisions to copy, rather than any more formal pricing agreement.

Courts have noted that the Sherman Act prohibits *agreements*, and they have almost uniformly held, at least in the pricing area, that such individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do *not* constitute an unlawful agreement under section 1 of the Sherman Act. *See, e.g., Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253–54 (2nd Cir.1987); *North Carolina v. Chas. Pfizer & Co.*, 384 F.Supp. 265 (E.D.N.C.1974), *aff'd*, 537 F.2d 67 (4th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976); 6 Areeda & Turner ¶ 1433; *cf. Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir.1983) (similar analysis in criminal conspiracy context). That is not because such pricing is desirable (it is not), but because it is close to impossible to devise a judicially enforceable remedy for "interdependent" pricing. How does one order a firm to set its prices *without regard* to the likely reactions of its competitors? *See* 6 Areeda & Turner ¶¶ 1432–33; 3 Areeda & Turner ¶ 840. The district court pointed out that the evidence here, consisting of little more than the price lists, would not permit a finding of more than such individual, interdependent, price setting. We agree.

■ c. Appellant points to the testimony of its expert, who said that the price lists show an agreement to follow a "basing point" pricing scheme. Such a scheme essentially amounts to a device that could help a group of firms in a concentrated industry "police" interdependent pricing practices, practices that help them keep prices above competitive levels without the need for any formal price agreement. As just mentioned, in principle, each firm in such an industry may set its prices knowing that a price cut would be quickly matched by others; each would also know that stable high prices, maintained by all firms, would benefit all. But, the problem for such firms (at least in principle) is that each also knows that for it alone the best of all possible worlds is to attract customers through a small price cut *not matched*

by the others. Since *all* know this, how can they keep each other from cutting prices? How can they guarantee that industry prices stay high? How can they prevent the forces of competition from breaking out, with one or another firm yielding to the temptation to cut its own prices while hoping the others will *not match* the low price? Each firm realizes that any formal communication with its competitors about such matters could lead to antitrust prosecution and a finding of a traditional agreement. But each fears that, without such communication, its competitors will "chisel" on the tacit pricing arrangement, perhaps through secret or selective price cuts (which from the public's point of view should be encouraged). *See United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

In principle, "basing point pricing" is a practice that might help firms stop (what from the public's perspective would be desirable) "chiseling." It does so when firms in the industry typically sell many different, related products, in many different geographical markets, all at different prices, a fact that makes it that much more difficult for each firm to know whether its competitors may be "chiseling," say, by "swallowing" some of the freight costs. A "basing point" pricing system involves all firms charging identical freight costs (irrespective of plant location or actual freight costs) to any point in the United States. The "freight prices" charged are those that a railroad or trucker would set from a single, fixed location (say Chicago), not from where each plant is actually located. Such a system makes it far easier for each firm to know the "freight cost" that a competitor is "supposed" to charge its customers, thereby making it easier for each firm to detect whether a competitor is charging a particular customer a lower price for the product. To that extent, "basing point pricing" helps each firm detect "chiselers"; it lessens the fear of each that others may be "chiseling"; and it thereby helps them all maintain prices above competitive levels. (It also tends to permit firms to release "safely" any "competitive

impulse," by selling, at greater expense and with less profit, to more distant locations all without changing the apparent price of the product, thereby helping further reinforce the stability of an industry's "high price" practices.) For these reasons, "basing point pricing" systems have normally been found unlawful. *See* 6 Areeda & Turner ¶ 1435f; *Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). Indeed, in the case of "basing point pricing," unlike simple "interdependent price setting," agencies, believing they can devise an appropriate remedy, have forbidden the practices even when the firms adopt it "interdependently," without any traditional agreement (perhaps through gradual, tacit evolution in the industry). *See Triangle Conduit & Cable Co. v. Federal Trade Commission,* 168 F.2d 175 (7th Cir.1948), *aff'd by an equally divided Court sub nom. Clayton Mark & Co. v. Federal Trade Commission,* 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110 (1949) (Federal Trade Commission held basing point pricing unlawful even though there was no *agreement*).

Our description of "basing point pricing," while simplified, is sufficient to show that the evils of the practice lie in its tendency to help firms keep prices high, not low. Thus, if such a practice existed in respect to couplings, it kept CISPI prices *high,* making it easier for Clamp–All to compete. Clamp–All cannot base its damage suit upon a scheme that *helps* it sell its product. *Matsushita,* 475 U.S. at 583, 106 S.Ct. at 1354.

■ d. Finally, Clamp–All adds together its first and second theories. It argues that the defendants behaved unlawfully by agreeing to charge high prices on some products, and then used the proceeds of their high price sales to finance below cost coupling prices. The short answer to this claim, however, is that the only important element here for a court to examine at the request of a competitor is the *low* price. If that price is unlawfully low, if, for example, it is a predatory price, it does not ordinarily matter whether the money to pay for the resulting temporary loss comes

486

from a bank account, a legacy, a lottery prize, or the proceeds of a price-fixing conspiracy in respect to another product; regardless of financing source, the practice would be unlawful. Where, however, as here, a plaintiff does not show that the low price is unlawfully low, there is no reason to believe the low price is not self sustaining, there is no reason to believe it requires 'external financing,' and there is no reason to believe that any "price fixing" on any other products has anything significant to do with the matter. *See Shore Gas and Oil Co. v. Humble Oil & Refining Co.*, 224 F.Supp. 922, 926–27 (D.N.J.1963). We do not see how a dubious kind of "financing source" could, in and of itself, convert a lawful low price into an unlawful one.

### III

■ We turn next to Clamp–All's claims that the CISPI defendants agreed to engage in certain unreasonably anticompetitive activities, in violation of Sherman Act § 1. In evaluating these claims, one must keep in mind the special antitrust meaning of the terms "reasonable" and "unreasonable," a meaning that draws its content from the basic objectives of antitrust law's "rule of reason." The Supreme Court adopted the "rule of reason" in order to provide an intellectually, administratively, and legally satisfactory way to limit the Sherman Act's broad language, which, if taken literally, might forbid all agreements, good and bad, that were in any sense at all "in restraint of trade." *See United States v. Trans–Missouri Freight Association*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). Chief Justice White pointed out (with only slight exaggeration) that without some such limitation, the Sherman Act might be taken as forbidding virtually "every conceivable contract or combination ... anywhere in the whole field of human activity." *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). The "rule of reason" limits the Act's literal words by forbidding only those arrangements the anticompetitive consequences of which outweigh their legitimate business justifications, 7 Areeda & Turner

¶ 1500 at 362–63, though certain anticompetitive practices, such as price fixing, so typically lack justification as to be *per se* unreasonable. 7 Areeda & Turner ¶ 1509.

■ "Anticompetitive", too, has a special meaning. It refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process. *Brown Shoe Co. v. United States*, 370 U.S. 294, 319–20, 328–34, 82 S.Ct. 1502, 1521, 1525–29, 8 L.Ed.2d 510 (1962); *see Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977). And, the law assesses both harms and benefits in light of the Act's basic objectives, the protection of a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods. *See Interface Group, Inc. v. Massachusetts Port Authority*, 816 F.2d 9, 11–12 (1st Cir.1987); 7 Areeda & Turner ¶ 1502.

■ The joint practices and agreements that appellant attacks here are not *per se* unreasonable. Thus, appellant must show that the likely anticompetitive effects of these practices outweigh their business justifications, or at least that the defendants might achieve any legitimate business objectives in a significantly less restrictive way. 7 Areeda & Turner ¶ 1505b.

### A

Clamp–All's major attack concerns CISPI's promulgation of a standard called the 310 Designation. That standard is entitled

Specifications for
CAST IRON SOIL PIPE INSTITUTE'S APPROVED COUPLING FOR USE IN CONNECTION WITH HUBLESS CAST IRON SOIL PIPE AND FITTINGS FOR SANITARY STORM DRAIN, WASTE AND VENT PIPING APPLICATIONS

The specification consists of several pages of detail. It also states,

Several different types of hubless joints or couplings are available for use in hubless cast iron systems.... It is the purpose of this specification ... to furnish

information as to the approved characteristics of one of such type couplings which is approved by the Institute [CISPI].

And, it states on the first page,

Members of the Institute who are licensed to use the Institute's Collective Mark ₵ NO–HUB and who sell hubless couplings manufactured by or for them which conform fully to this Specification may indicate their membership in the Institute and their conformance with this Specification by marking such couplings with the Institute's Collective Mark ₵ NO–HUB.

CISPI successfully persuaded various private standard-setting bodies, as well as state and local plumbing code authorities, to make reference to the 310 Designation as the kind of coupling that would meet their respective standards.

▆ a. Appellants seem to say that CISPI's very promulgation of this standard and its efforts to secure its adoption by certifying authorities amounts to an unreasonable restraint of trade. We do not see how that can be so. The standard, in specifying what counts as a CISPI coupling, provides a relatively cheap and effective way for a manufacturer or a buyer to determine whether a particular coupling is, in fact, (generically considered) a CISPI coupling. The adoption by certifiers helps users quickly and effectively determine that a particular coupling (which meets CISPI standards) also meets state, local, or private certifiers' standards of acceptability. The *joint* specification development, promulgation, and adoption efforts would seem less expensive than having each member of CISPI make duplicative efforts. On its face, the joint development and promulgation of the specification would seem to save money by providing information to makers and to buyers less expensively and more effectively than without the standard. It may also help to assure product quality. If such activity, in and of itself, were to hurt Clamp–All by making it more difficult for Clamp–All to compete, Clamp–All would suffer injury only as a result of the defendants' joint efforts having lowered information costs or created a better product.

See *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 558 & n. 19 (1st Cir.1974). And, *that* kind of harm is not "unreasonably anticompetitive." It brings about the very benefits that the antitrust laws seek to promote. That is to say, activity that harms competitors because it lowers production or distribution costs or provides a better product carries with it an overriding justification.

Of course, what we have just written is true of 'legitimate' standard-setting activity. *See Whitten,* 508 F.2d at 558 n. 19. There could be special circumstances, showing, in an individual case, that the standard setting at issue serves no legitimate purpose, or that it is unnecessarily harmful. *Id.* (antitrust claim stated if market participant who establishes proprietary specifications coerces a standard-setting organization or conspires with it to get the specification officially adopted, or if it prevents competitors from competing for approval). But the plaintiff would have to show the existence of such circumstances; and, the plaintiff has not done so here. The best it can do is point to the word "approved" in the specification ("it is the purpose of this specification ... to furnish information as to the approved characteristics of one of such type couplings which is approved by the Institute.") and to argue that that single word might mislead users into thinking that CISPI is a disinterested certifying organization, providing "approvals" for all hubless couplings, thereby hurting Clamp–All, unless, as Clamp–All seems to argue, CISPI considered Clamp–All's coupling for "approval" as well, *see Radiant Burners, Inc. v. Peoples Gas Light & Coke,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); 2 J. von Kalinowski, *Antitrust Laws and Trade Regulation,* § 61.01 (1988); Wachtel, "Products Standards and Certification Programs," 13 *Antitrust Bull.* 1, 13 (1968).

▆ The dispositive answer to this argument is that the record contains no significant evidence that the word "approved" misled anyone. The specification itself makes clear what it is, a specification that applies to *CISPI-type* hubless couplings,

not to *all* hubless couplings. It contains no other language that might make one think that CISPI was some kind of general certifying organization. Buyers of hubless couplings are builders, plumbers, or contractors—reasonably sophisticated users—and there is no testimony that any of them was fooled. Plaintiff's best evidence consists of a comment by its expert that "people who normally use these things ... could easily be misled," but, on cross examination, that same expert conceded that he had not talked to normal coupling users in forming that particular opinion. In our view, that opinion alone, so lacking in foundation, cannot take the issue of "being fooled" to the jury. And, if CISPI was not (or at least was not thought to be) a general certifying organization, why must it develop a specification for, or somehow "certify," a competitor's quite different product? After all, General Motors need not certify the quality of a Toyota, nor need a group of film producers certify the quality of competing live television programs.

b. Clamp–All argues that CISPI defendants prevented an important "standard-setting and approval-granting" organization, the American Society of Sanitary Engineers ("ASSE"), from approving a hubless coupling performance standard that would have benefitted Clamp–All. In theory, one can understand how joint activity of the kind Clamp–All alleges could be unreasonably anticompetitive. Suppose, for example, the ASSE was about to adopt a performance standard that both CISPI and Clamp–All could have met; suppose further that ASSE's adoption of such a standard would have led to the adoption of a similar standard by hosts of local and state regulatory, and private certifying authorities. Then Clamp–All simply could have pointed to the standard (and its compliance) to show a contractor that its product was approved, just as CISPI does in states that have referenced the 310 Designation. If CISPI prevented the adoption of such a standard, it *may* have acted unreasonably.

■ The key word here, however, is "may." Certifiers may reasonably believe that they can do their job properly (a job that benefits consumers) only if all interested parties are allowed to present proposals, frankly present their views, and vote. Thus, we do not see how plaintiff could succeed on its antitrust claim unless (at a minimum) CISPI *both* prevented ASSE from adopting a national performance standard that would have benefitted Clamp–All *and* did so through the use of unfair, or improper practices or procedures. *See Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938 (2nd Cir.) (antitrust claim stated where defendant conspired with other steel companies to block the approval of plaintiff's product by a national certifying organization; defendant acted within the letter of the organization's rules, but violated their spirit by paying for and packing a meeting with voters who had little to no professional interest in the subject matter), *aff'd*, —— U.S. ——, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (affirming denial of *Noerr–Pennington* immunity for defendant's effort to influence *private* standard-setting organization; dismissing certiorari in respect to whether defendant's conduct was an unreasonable restraint of trade). In deciding whether this is so, courts must take account of the importance of permitting parties to express their views freely before regulatory authorities. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965) ("Joint efforts to influence *public* officials do not violate the antitrust laws even though intended to eliminate competition" (emphasis added)); *cf. Allied Tube & Conduit Corp. v. Indian Head, Inc.*, —— U.S. ——, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (efforts to influence *private* standard-setting organizations *may* violate antitrust laws).

■ The record here does not contain evidence sufficient to warrant presenting Clamp–All's claim to the jury. It shows that in 1979, at Clamp–All's request, the ASSE formed a subcommittee to write a hubless coupling standard. Clamp-All proposed a four-tier standard (rating couplings by their ability to withstand varying levels

of water pressure). Initially, when only one CISPI representative was present, the subcommittee recommended a three-tier standard (which was also beneficial to Clamp–All). CISPI then decided to offer a single tier standard, which both the CISPI and Clamp–All couplings would have met. It wrote its members and urged them to attend the next meeting. At that next meeting, with six CISPI members attending out of a total of sixteen, the subcommittee changed its mind and voted for CISPI's proposed standard. The ASSE eventually decided not to accept its subcommittee's recommendation, and it took no further action.

We can find no concrete evidence in the record that CISPI acted improperly. The record here is unlike that in *Indian Head,* where the defendant "packed" the meeting by hiring lay voters in numbers that unfairly gave it overrepresentation. Nor is there concrete evidence that the submission of CISPI's proposal caused (or even influenced) ASSE's decision not to adopt any standard. Clamp–All points to a single statement by CISPI's general counsel that the CISPI one-tier proposal was "not really a performance standard." We do not see how that statement shows a significant abuse of ASSE's procedural standards or practices. Rather, as far as the record is concerned, CISPI acted within the letter and the spirit of the ASSE rules in presenting its proposal and urging its members to attend the meeting.

### B

Clamp–All claims that the defendants have jointly engaged in several unreasonably anticompetitive "business practices." For the most part these claims amount to charges of state-law business torts, not violations of the federal antitrust laws. *Whitten,* 508 F.2d 560–62. We assume that point aside, however, for the sake of argument, and because of appellant's later Lanham Act claim, *see* pp. 491–492 *infra.* We have examined the evidence in respect to each alleged act, and we conclude that no reasonable jury could find a significant,

unreasonably anticompetitive business practice that harmed Clamp–All.

a. Appellants say that CISPI marketed its trademarked pipe, fittings, and couplings together as a system, thereby deceptively suggesting that Clamp–All's coupling would not fit the system. The evidence appellant presented to show deception consisted of an advertisement that said:

> You cannot afford to use any other coupling but the CISPI stainless steel couplings for a COMPLETE ₵ NO–HUB system.

We have no reason to believe that CISPI's advertisement was significantly misleading in the industry context. This language is of a kind characterized in *Whitten,* 508 F.2d at 556, as mere "sellers' talk." Moreover, CISPI aimed the advertisement at a technical audience, which would likely know enough not to find it significantly misleading in respect to whatever suggestion it might have made that Clamp–All's coupling would not fit the "system." (See the discussion under 'e' below.) We do not see how a jury, without more evidence than this vaguely worded advertisement, could find otherwise.

b. Appellant says that CISPI advertises its collective mark, ₵ NO–HUB, as a sign of quality, but, in fact, that advertising is deceptive because CISPI does not control the quality of the product. Clamp–All adds that there are "numerous examples of defective products bearing the ₵ NO–HUB trademark."

The record, however, contains only evidence of failures of CISPI *fittings* (curved pieces of pipe used to change the direction of the flow); it does not contain any evidence of any failure of any CISPI *coupling.* Appellant points to a Davidson Laboratory test as evidence, but that test shows that Clamp–All's more expensive coupling withstood strong water pressure more successfully than CISPI's; it did not show that CISPI's coupling was defective. Given the evidence, the logical links between "defective fittings," "no quality control," and "deceptive trademark use" in

respect to coupling sales are too farfetched to warrant submission to the jury.

■ c. Clamp–All says that CISPI published test results favorable to its products but did not publish unfavorable test results. But the law, as far as we are aware, does not automatically require a firm to publish unfavorable test results.

■ Clamp–All adds that the favorable report—the PTL report—was misleading. The district court did not permit appellant to introduce that report, however, because it said the jury would not understand its significance without the help of an expert (and appellant had not designated an expert to testify about the report). We confess that we cannot understand the relevance of Clamp–All's complaint about the report. (It has something to do with the fact that the report explained that the ends of the pipes used in the test were "uncoated," but it did not explain that the ends were "machined off"). Our own inability to understand the relevance of Clamp–All contention leads us to conclude that the district court acted well within its powers in not admitting the report without expert explanation. *See* J. Weinstein & M. Berger, 3 *Weinstein's Evidence* ¶ 702[02] and cases cited at 702–9 n. 3 (1987).

■ d. Appellant says that CISPI members sometimes used the wrong trademark: they used the words "NO–HUB" instead of "℄ NO–HUB." The only evidence that this is so, however, consisted of two of the defendants' price lists where the words "NO–HUB" appeared. The district court, noting that the lists contained all sorts of errors, concluded that this evidence would not permit a jury to find an intentional use of the wrong mark. We believe the court was correct.

■ e. Clamp–All says that CISPI improperly injured its reputation, first, by delivering (on several occasions during a six-month period) defective fittings to a site where contractors were using Clamp–All couplings, and second, by stating (at a press conference) that the Clamp–All coupling does not properly fit the CISPI system. The record presents uncontradicted evidence, however, that defective fittings are fairly common in the industry and that CISPI couplings tolerate common defects in the fittings, but Clamp–All couplings do not. That being so, a jury could not find, on the basis of this evidence, any deliberate plan to sabotage Clamp–All or its reputation, of a sort that could rise to the level of an antitrust violation. *See Whitten*, 508 F.2d at 560–62.

■ f. Clamp–all argues that CISPI should have allowed it to become a member. CISPI, however, is an association of pipe and fitting manufacturers, some, but not all, of whom also make CISPI couplings. Clamp–All does not make pipe or fittings (or, for that matter, CISPI couplings). There is, therefore, nothing unreasonable about CISPI's not accepting Clamp–All for membership. *See generally* 2 J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 61.02 (1988) (all members of an industry should be eligible for membership, but membership can be limited, for example, to "those operating at a certain level in the distribution chain").

■ We add two final points in respect to Clamp–All's antitrust claims. First, we cannot guarantee that we have found every bit of supporting evidence in the fourteen volumes of record. We have, however, examined the record with care, particularly those parts of it that the parties cited, and we are convinced there is no other evidence that could have made a difference to our conclusion. Second, appellant also brought charges of monopolization and attempted monopolization. 15 U.S.C. § 2 (1982). We have assumed, for the sake of argument, that CISPI manufacturers account for a large share of the coupling industry, but that they do not account for all, or nearly all, its sales. (The district court properly refused to allow plaintiff's expert to present precise market share figures because that expert based his opinion significantly upon a few unmemorialized telephone calls, and estimated the reliability of his model as between "1 percent and 99 percent," Fed.R.Evid. 403; *see, e.g., American Bearing Company, Inc. v. Litton Industries, Inc.*, 540 F.Supp. 1163 (E.D.Pa.

1982), *aff'd,* 729 F.2d 943 (3rd Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).) That being so, the same reasons that have led us to find appellant's case inadequate in respect to the unreasonableness (or anticompetitive tendencies) of its § 1 "anticompetitive practice" claims and its pricing claims, lead us to conclude that it could not show "exclusionary conduct" in respect to its monopolization or attempted monopolization claims. *See* 3 Areeda & Turner ¶ 626 at 83, *cited in Barry Wright,* 724 F.2d at 230.

## IV

 The appellant's complaint also asserted a violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a) (1982), which reads, in relevant part, as follows:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, a false designation of origin, or any false description or representation, ... shall be liable to ... any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The complaint alleged that "defendants have used false descriptions or representations in connection with the sale of hubless couplings." The district court dismissed this count of the complaint on the ground that this circuit's previous opinions have narrowly interpreted the Lanham Act to apply only to those sorts of unfair business practices or false statements that "are of the same economic nature as those which involve infringement or other improper use of trade-marks," *e.g.,* palming off one's goods as those of another. *Samson Crane Co. v. Union National Sales, Inc.,* 87 F.Supp. 218, 222 (D.Mass.1949), *aff'd per curiam,* 180 F.2d 896 (1st Cir.1950); *see also Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444–45 (Fed.Cir. 1984); *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 160 (1st Cir.1977) ("The basis for an action under this section is use of a mark in interstate commerce which is likely to cause confusion or to deceive purchasers concerning the *source* of the goods [ (emphasis added) ] ").

Appellant concedes it cannot meet this standard. But it notes that other circuits have adopted more liberal views of the statute, some indicating that it in essence creates a private right of action for ordinary "false advertising." *See U–Haul International, Inc. v. Jartran, Inc.,* 681 F.2d 1159 (9th Cir.1982); *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186 (2nd Cir.1980); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649 (3rd Cir.1954); *see generally* 2 J. McCarthy, *Trademark and Unfair Competition* § 27:4 (2nd ed. 1984). Appellant also points to cases where we have cast doubt on the validity of *Samson Crane. See Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482 (1st Cir.1981) (plaintiff sought overturning of *Samson Crane;* court acknowledged merit of plaintiff's position, but declined to express an opinion); *Electronics Corporation of America v. Honeywell, Inc.,* 487 F.2d 513, 514 (1st Cir.1973) ("in relying on the district court opinion, we do not indicate necessary agreement with its conclusion that palming off is not an essential element of a Lanham Act claim"); *see also Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods,* 799 F.2d 6 (1st Cir.1986) (harm is of traditional "protection of proprietary mark" variety, but does not involve palming off). Appellant asks us to reconsider the validity of *Samson Crane* in light of our, and other circuits', subsequent cases.

After examining the record, however, we have concluded that this is not an appropriate case in which to reconsider the validity of *Samson Crane.* Appellant had an opportunity to present its "false advertising" evidence in support of its antitrust claim, and we assume it did so. *See* pp. 489–490, *supra.* In light of that evidence, we believe it undesirable to prolong the case, for, even were we to reconsider *Samson Crane* and remand, it seems unlikely that appellant could win its action. We therefore continue to assume the validity of *Samson Crane,* and postpone its reconsideration for another day.

Finally, we affirm the pretrial dismissal of defendant American Brass & Iron

Foundry on jurisdictional grounds for substantially the reasons noted by the district court. Appellant makes various other claims, which we find completely without merit. The judgment of the district court is

*Affirmed.*