**KASCO CORPORATION, Plaintiff,**

v.

**GENERAL SERVICES, INC., Defendant.**

**Civ. A. No. 95–11632–WGY.**

United States District Court,
D. Massachusetts.

Oct. 31, 1995.

---

Michael T. Gass, Harvey Nosowitz, Palmer & Dodge, Boston, MA, for Plaintiff.

Albert H. Russell, Jr., Medford, MA, for Defendant.

## MEMORANDUM

YOUNG, District Judge.

In this action, Kasco Corporation ("Kasco"), a manufacturer of knives and plates for use in meat choppers, challenges the business practices of one of its rivals, General Services, Inc. ("General Services"), alleging trademark infringement under the Lanham Act, 15 U.S.C.A. § 1125 (West Supp.1993), common law unfair competition, replevin, conversion, tortious interference with advantageous relations, and unfair or deceptive acts or practices in violation of Mass.Gen.L. ch. 93A, §§ 2, 11. General Services has moved for summary judgment on the sole federal claim, claiming that under the traditional restrictive interpretation of the Lanham Act by the First Circuit, Kasco has not stated a claim. Without a federal hook, General Services further requests that the court decline to exercise jurisdiction over the remaining state-law claims.[1] Kasco argues that the 1988 amendment to the Lanham Act wipes away the First Circuit's narrow approach and instead codifies the more expansive reading of the statute embraced by most other circuits, thereby creating a regime in which the conduct Kasco alleges constitutes a violation. Kasco has cross-moved for summary judgment on the Lanham Act claim as well. The parties have filed duelling and often contradictory affidavits.

Based upon the record currently before it, the Court held on October 18, 1995 that there are genuine issues of material fact and that neither party is entitled to judgment on the Lanham Act claim as matter of law. The motions were therefore denied. This memorandum explains that ruling.

## I. Background

The following facts are essentially undisputed: Kasco is a Delaware corporation with a principal place of business in St. Louis, Missouri. Kasco manufactures cutlery knives and plates for use in meat choppers. Kasco does not sell its knives or plates, but rather leases them to customers, including

---

1. General Services also contends that the amount in controversy does not exceed the $50,-000 minimum required for the exercise of diversity jurisdiction. Given the Court's refusal to dismiss the Lanham Act claim, it need not decide the issue.

retail supermarkets, and provides services, such as regular sharpening, for its products. The knives and plates leased by Kasco are marked with one or more of the following marks: "KASCO"; "KASCO NEVER SOLD"; "NEVER SOLD KASCO"; "PROPERTY OF KASCO"; and "HOOK–EYE NEVER SOLD." General Services is a Massachusetts corporation with headquarters in Medford, Massachusetts, and is a competitor of Kasco's. Over the last few years, many Kasco customers have discontinued leasing Kasco knives and plates and using Kasco to service them, instead entering into similar relationships with General Services. It is apparently the practice in the industry for representatives of Kasco or General Services to visit each customer regularly, retrieve the dull knives and plates in the machines, and replace them with sharpened knives and plates. The dull knives and plates are then sharpened and sent out to other customers.

Kasco alleges, through the affidavits of its manager of field support operations, Joanne Schoemehl ("Schoemehl"), and one of its territory managers, Lou Meola ("Meola"), that numerous former customers of Kasco, now with General Services, continue to use knives and plates manufactured by Kasco. According to Meola:

> Recently, I have visited a number of former customers who switched to [General Services] and asked to see the knives or plates that [General Services] had leased them. I also visited a number of [General Services] customers who had not been customers of Kasco and made the same request.
>
> In a number of instances these knives and plates were manufactured by and were the property of Kasco. I was able to recognize them as Kasco plates by their design, and in some cases because they bore Kasco marks or product numbers which only appear on knives and plates manufactured and owned by Kasco. In many cases the Kasco marks had been partially or completely ground off.

Affidavit of Lou Meola ¶¶ 6, 7. Meola then lists six locations at which he discovered Kasco products being used by former Kasco customers now with General Services: Shaw's Supermarkets in Hanover, Melrose, Stoneham, Sharon, and Braintree, and a Bread & Circus in Cambridge. Meola also claims to have seen Kasco products at stores which were never Kasco customers but are now serviced by General Services: a Purity Supermarket in Kingston and Star Markets in Lynn and Swampscott.

In his first affidavit, filed with the Court on August 30, 1995, the president of General Services, Benjamin Maganzini ("Maganzini"), averred that his company does not manufacture knives or plates, but buys them from various sources, including Kasco. He states that earlier this year, General Services purchased cutlery and other meat-related equipment, including nine meat grinders, from a Rhode Island supermarket, Almac's, that was going out of business. Inside each machine were two sets of knives and plates, making a total of eighteen sets, some of which contained a Kasco stamp. General Services maintains that it purchased these Kasco materials in good faith and holds title to the goods, which it has since used in the ordinary course of business. Maganzini thus conceded that General Services has in its stock and in circulation knives and plates bearing a Kasco mark, but claimed awareness of no more than the eighteen sets purchased from Almac's. Maganzini concludes by asserting that General Services has never: marketed its own plates as having been manufactured by Kasco; taken any non-Kasco knives or plates and marketed or represented them as having been manufactured or licensed by Kasco; taken its own knife and plate sets and marked them with the Kasco name or any similar mark; placed its own plates or knives in packaging designed to confuse customers; or used any containers for shipment of goods with the Kasco mark.

In a second affidavit, filed with the Court on September 11, 1995, Maganzini launched a frontal attack on Meola's affidavit. He obtained, and attached, affidavits from the meat managers at the Stoneham and Melrose Shaw's Supermarkets and the Lynn Star Market, each stating: "A KASCO representative has never been in my meat room to inspect for their property, (plates and

knives). I never authorized anyone from KASCO to do this search." The Melrose meat manager further challenges Meola's statement that Meola had observed "# 22" Kasco knives and plates at that particular store, averring that the Melrose Shaw's uses neither # 22 knives nor # 22 plates. Maganzini also states, contrary to Meola's affidavit, that the Cambridge Bread & Circus uses # 32–sized knives and plates, not # 52; that the Kingston Purity is not a customer of General Services'; and that the Swampscott Star Market was formerly a Kasco customer.

The plot thickening, Maganzini next states that on July 3, 1995, he "happened to observe" Meola parking at a "coffee establishment" in Everett. Maganzini parked next to Meola's car and then "noticed" a note in the front seat, "in plain view," on which someone, presumably Meola, had written, "Waltham Beef—No p & k." Waltham Beef is a major customer of General Services. Maganzini saw many other entries on the note showing "no p & k," but was not able to read the locations. Finally, Maganzini reports that the meat managers of two General Services customers told a General Services employee, who told Maganzini, that a Kasco representative had entered the stores and told the meat managers that he was "taking a survey."

Also on September 11, 1995, Schoemehl filed a Supplemental Affidavit, asserting that Kasco's practice of never selling knives or plates with its mark is common practice in the industry and that Kasco's conformance with this policy is common knowledge. She further states that she has received reports from Meola and others on visits to approximately 150 General Services' customers by Kasco employees, and that Kasco personnel have reported over forty instances in which General Services customers were using machines with Kasco knives or plates. Regarding the eighteen sets allegedly purchased by General Services from Almac's, Schoemehl states that she has determined that while Kasco retrieved some of its leased knives and plates from some Almac's stores, it did not retrieve them from that particular Rhode Island Almac's. Finally, she avers that Kasco has lost over 500 customers to General Services over the last five years, resulting in the loss of approximately $280,000 in sales per year.

On September 13, 1995, General Services filed another affidavit from an "authorized representative" of the Cambridge Bread & Circus averring that no Kasco representative has ever been in his meat room to inspect for Kasco property, and that he never authorized anyone to conduct such a search.

Completing the factual record, Maganzini filed a third affidavit of his own on September 27, 1995. He explained:

> It is a common phenomenon in the industry in which [General Services] serves for the knives and plates of one grinder to be found in the inventory of another, even in the absence of bad faith. This phenomenon occurs when one "grinder" loses the business of a customer, and is replaced by a second grinder. Since most plates and knives resemble each other, and often are manufactured by the same manufacturer, in the rush for a route driver to accomplish as much as he can in a given period of time, it sometimes occurs that one of our route drivers has unknowingly brought back a plate and knife from Kasco to [General Services]. The likelihood of this phenomenon increases when the losing grinder fails to "police" his product upon the loss of the customer.

Third Affidavit of Benjamin Maganzini ¶ 3. He goes on to say that he instituted an inquiry on September 15, 1995 to determine how many knives and plates with Kasco labels or marks are in his company's stock, and that he has begun to withdraw from service and segregate all such knives and plates. As of September 26, 1995, General Services had identified thirty-nine plates and three knives with Kasco marks, but "[t]his number may increase as our route drivers bring in plates and knives from our customers." General Services continues to assert ownership to eighteen of the thirty-nine plates.

## II. The Lanham Act Claim

### A. General Services' Motion

As noted, General Services has moved for summary judgment on the trademark claim and to dismiss the state claims. Its entitle-

ment to summary judgment depends on the propriety of two related propositions: 1) the 1988 amendment to the Lanham Act did not render academic the First Circuit's long-standing restrictive interpretation of conduct proscribed by the statute; and 2) Kasco's allegations charge General Services with a practice known as "reverse palming off" which has not constituted—and still does not constitute—a violation of the Lanham Act in this circuit. The Court cannot credit either proposition.

### 1. The Lanham Act

■ The version of the Lanham Act in effect from July 5, 1947 to November 16, 1989 made civilly liable

> [a]ny person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce ...

15 U.S.C.A. § 1125(a) (West 1982) (commonly known by its Public Law designation, "Section 43[a]"). For many years, the First Circuit took a stingy view of the scope of Section 43(a). *See Clamp–All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 491 (1st Cir.1988) (Breyer, J.), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989); *Boothroyd Dewhurst, Inc. v. Poli*, 783 F.Supp. 670, 682–83 (D.Mass.1991) (Freedman, C.J.); *Samson Crane Co. v. Union Nat'l Sales, Inc.*, 87 F.Supp. 218, 222 (D.Mass.1949), *aff'd*, 180 F.2d 896 (1st Cir. 1950). In the seminal case of *Samson Crane*, the district court held that the Lanham Act

> must in such a context be construed to refer not to any competitive practice which in the broad meaning of the words might be called unfair, but to that "unfair competition" which has been closely associated with the misuse of trademarks, i.e., the passing off of one's own goods as those of a competitor.

87 F.Supp. at 222. Despite numerous invitations to jettison *Samson Crane*'s limitation of claims to situations involving the so-called "palming off" of goods, where one's own goods or services are sold under the name of another, courts in this circuit have consistently, if reluctantly, refused to do so. *See Clamp–All*, 851 F.2d at 491 (while noting more liberal view taken by other circuits and acknowledging First Circuit precedent casting doubt on continuing validity of *Samson Crane*, Court of Appeals refused to reconsider its interpretation of the statute's reach); *Boothroyd*, 783 F.Supp. at 682–83 ("Although the case law in the First Circuit is somewhat ambiguous, and despite the fact that restrictive interpretations ... have been criticized, the weight of authority in this district favors" the position that Section 43[a] only encompasses claims involving attempts to use similar marking or packaging to create a false impression of origin).

The majority case law ran in the opposite direction, interpreting the Lanham Act to proscribe all sorts of unfair competition beyond the prototypical palming off of goods. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 781–82, 112 S.Ct. 2753, 2764, 120 L.Ed.2d 615 (1992) (Stevens, J., concurring) (Section 43[a] "has been widely interpreted to create, in essence, a federal law of unfair competition"); *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1140 (3d Cir.1986) ("Section 43[a] of the Lanham Act proscribes not only trademark infringement in its narrow sense, but more generally creates a federal cause of action for unfair competition"). For example, many courts have held that "reverse palming off," usually defined as the passing off of as one's own product goods actually produced by another, falls within the ambit of Section 43(a). *See, e.g., Web Printing Controls Co. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1203 n. 1 (7th Cir.1990); *Smith v. Montoro*, 648 F.2d 602, 607 (9th Cir.1981). Claims of false advertising and false endorsement have also commonly been held actionable under Section 43(a). *See, e.g., Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1106–107 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993); *U–Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1161 (9th Cir.

1982). The Ninth Circuit has cited a noted commentator who concluded that the law of unfair competition and trademarks "has progressed far beyond the old concept of fraudulent passing off, to encompass any form of competition or selling which contravenes society's current concepts of fairness." *Smith,* 648 F.2d at 604 (quoting 2 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 25:1).

In 1988, Congress amended Section 43(a) to read:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a)(1) (West Supp.1993).

General Services argues that the amendments did not greatly, if at all, expand the areas of prohibited conduct. While this may be correct in some sense, it is of no avail to General Services because the amended statute codified the body of case law that had sprouted in most circuits from the old act rather than the restrictive, minority approach of the First Circuit:

> Congress codified the judicial interpretation of § 43(a), giving its imprimatur to a growing body of case law from the Circuits that had expanded the section beyond its original language.

*Two Pesos,* 505 U.S. at 783, 112 S.Ct. at 2764 (Stevens, J., concurring); *see also Barrus v. Sylvania,* 55 F.3d 468, 469 n. 2 (9th Cir.1995) (Lanham Act amendment "generally codif[ied] the judicial interpretation" of Section 43[a] ); *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,* 40 F.3d 1431, 1443 (3d Cir. 1994) (Congress approved judicial creation of federal unfair competition law by enacting amendments); *Gordon and Breach Science Publishers S.A. v. American Inst. of Physics,* 859 F.Supp. 1521, 1531 n. 5 (S.D.N.Y.1994) (amendments did not "impose new duties or liabilities but rather codified existing Lanham Act case law"); S.REP. No. 515, 100th Cong., 2d Sess. 40–41 (1988), *reprinted in* 1988 U.S. CODE CONG. & ADMIN.NEWS 5577, 5603–604 (amendment "codif[ies] the interpretation [Section 43(a) ] has been given by the courts … [and] fills an important gap in federal unfair competition law"); 1 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 5.05[4] (3d ed. 1992).

Given the language of the amended Lanham Act, its unambiguous legislative history, and the subsequent uniform case law, there is little doubt that the statute codifies the dominant expansive interpretation of the old statute. In so doing, the amendment has consigned *Samson Crane* and its progeny to the dustbin of First Circuit jurisprudence.[2] *Cf. Nowak v. Tak How,* 899 F.Supp. 25, 31 (D.Mass.1995). In its place is a far more liberal regime prohibiting many more types of conduct falling within the broad rubric of "unfair competition."

## 2. Does the Amended Lanham Act Proscribe the Conduct Alleged by Kasco?

■ With the above legal framework in mind, the Court must now determine wheth-

---

2. The Court acknowledges but respectfully disagrees with the conclusion of Judge Gorton, in an unpublished opinion, that the amendment to the Lanham Act did not "substantively alter the reach of section 43(a)." *General Electric Co. v. Iljin Corp.,* No. 89–40094–GN, 1993 WL 41752, at *7 n. 8 (D.Mass. Feb. 12, 1993) (Gorton, J.). In that case, while upholding the validity of *Samson Crane* and holding reverse palming off not actionable, *id.* at *6, the court explicitly declined to rule which version of the statute applied, but conceded that the amendment did not become effective until two months after the suit was filed and "presumed" that the plaintiff alleged continuing violations after filing. *Id.* at *7 n. 6.

er Kasco's Lanham Act claim may survive summary judgment. Kasco's puts forward two theories of liability: (1) General Services illegally used knives and plates owned and manufactured by Kasco and bearing Kasco's proprietary marks to service its own customers in a manner likely to deceive customers into believing that Kasco endorses or approves General Services' use of Kasco products in connection with General Services' services; and (2) General Services falsely represented to its customers that the knives and plates used to service them were General Services knives and plates.

General Services responds that these allegations constitute "reverse palming off" which, so it says, is not actionable in this circuit. Such may have been the case in the prior regime; "reverse palming off" may very well now be actionable under the amended statute. The Court does not find, however, the use of broad and often carelessly or interchangeably used terms such as "palming off," "reverse palming off," "passing off," or "reverse passing off" to be particularly helpful in this case.[3] The facts and allegations in this case defy easy categorization, and must be examined on their own. Given the broad language of the amended Section 43(a) and the rich body of case law it was designed to codify, there is on this record a genuine issue of material fact as to whether General Services has committed a violation of the Lanham Act. General Services has conceded that it has used Kasco knives and plates in the machines it services, though it disavows any wrongful intent. Thus, as a factual matter, it would appear that General Services has reaped whatever benefits may accrue from the use of Kasco products—there is no evidence before the Court regarding the quality of Kasco's products and services relative to its competitors'—while representing to the end-user, the customer, that those benefits have reached their supermarket courtesy of General Services. Such conduct may be found by a reasonable finder of fact to be "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of the knives and plates installed by General Services. *See* 15 U.S.C.A. § 1125(a)(1) (West Supp.1993).

## B. Kasco's Cross–Motion

■ Nor is Kasco entitled to summary judgment on its Lanham Act claim based on its assertion that the conceded and continuous use by General Services of at least thirty-nine Kasco knives (only eighteen of which General Services claims to own) constitutes a per se violation. If it is in fact the industry-wide practice—in which Kasco has participated—for knives and plates to be all but abandoned upon the loss of a customer, and for the company receiving that customer's business to pick them up and return them to its own stock for sharpening and placement with other customers, then Kasco may be subject to the equitable defenses of acquiescence, estoppel, laches and the like. *See* 15 U.S.C.A. § 1117(a) (West Supp.1993) (successful Lanham Act plaintiff may recover damages "subject to the principles of equity"); *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 531 n. 6, 107 S.Ct. 2971, 2978 n. 6, 97 L.Ed.2d 427 (1987) (traditional equitable defenses available in Lanham Act action); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 418, 36 S.Ct. 357, 362, 60 L.Ed. 713 (1916) ("trademark rights, like others that rest in user, may be lost by abandonment, nonuser, laches, or acquiescence"); *Gasser Chair Co. v. Infanti Chair Mfg. Co.*, 60 F.3d 770, 777 (Fed.Cir.1995) (defenses of laches and estoppel available though inapplicable). Kasco cannot acquiesce in and benefit from a customary practice and then attempt to recover through litigation what it has lost through competition. Moreover, the record indicates, or certainly permits an inference of, an absence of strict controls by Kasco over its own inventory. Whether this laxity is a function of the expense of sending out employees to retrieve knives and plates, or of compelling lost customers to return them, is not for the Court to say. For its own part, Kasco does not deny the existence of the practice, nor does it claim to stand alone in the industry in rejecting the practice. Kasco merely states,

---

**3.** For an explanation and definitions of the often confusing terminology in this corner of the law, see 3 J. Thomas McCarthy, Trademarks And Unfair Competition § 25.01 (3d ed. 1995).

in connection with the disputed eighteen sets of plates and knives, "[W]hile [Kasco] retrieved its rental knives and plates from some Almac stores when they closed, it was unable to retrieve them from one store." Supplemental Affidavit of Joanne Schoemehl ¶ 15. In short, the record is insufficiently developed at this point to grant summary judgment to Kasco based on General Service's admitted use of Kasco products.

## III. Conclusion

Neither party is entitled to summary judgment on the federal Lanham Act claim, and thus the motion and cross-motion must be, and were, denied. The Court further exercises its pendent jurisdiction over the state law claims and therefore denied General Services motion to dismiss those claims as well.